**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**DAVENPORT DIVISION**

| | | |
|---|---|---|
| JULIE A. MCMANUS, | * | CIVIL NO. 3:15-cv-00123-JAJ-SBJ |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | **REPORT AND** |
| CAROLYN W. COLVIN, | * | **RECOMMENDATION** |
| Acting Commissioner of Social Security, | * | |
| | * | |
| Defendant. | * | |
| | * | |

**TABLE OF CONTENTS**

I. INTRODUCTION ……………………………………………………………………….. 2

II. PROCEDURAL HISTORY …………………………………………………….......... 3

III. REVIEW OF ADMINSTRATIVE RECORD …………………………………… 4

    A.  Medical Records …………………………………………………………… 5

    B.  Functional Capacity Assessment …………………………………………13

    C.  Testimony of Julie A. McManus ………………………………………15

    D.  Function Reports …………………………………………………………17

    E.  Testimony of Vocational Expert ………………………………………19

    F.  Findings of Administrative Law Judge ……………………………….. 21

IV. JUDICIAL REVIEW OF DECISION …………………………………………… 22

    A.  Standard of Review …………………………………………………….. 22

    B.  Analysis of McManus' Arguments ……………………………………… 24

        1.  Determination of Residual Functional Capacity ………………………… 25

            a. Assessment of McManus' Subjective Complaints …………………28

            b. Assessment of PA-C Brigham's Opinions …………………………34

        2.  Capability to Perform Other Jobs ………………………………………41

V. RECOMMENDATION …………………………………………………………….44

# I. INTRODUCTION

Plaintiff Julie A. McManus ("McManus") seeks judicial review of the Social Security Commissioner's decision denying her Application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, and denying her Application for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.*   McManus was found to suffer from the severe impairments of diabetes, post anal sphincter surgery, disorders of the back, and obesity.   While it was determined McManus is unable to perform any past relevant work, it was found that, considering her age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform.   Consequently, the Commissioner concluded McManus was not disabled for purposes of the Act.

McManus insists she is unable to engage in any substantial gainful activity due to her medical impairments and, therefore, is disabled under the Act and entitled to benefits accordingly. She asserts three primary arguments before this Court: (1) the determination of residual functional capacity was erroneous because it failed to incorporate limitations related to prolonged sitting and the need for frequent, unscheduled bathroom breaks and absenteeism from work; (2) the assessment of the credibility of her subjective complaints related to those limitations was erroneous; and (3) the Commissioner did not sustain the burden of proving other work exists in the economy which McManus can realistically perform.   McManus requests that this Court reverse the decision of the Commissioner and remand her claim for the calculation of benefits.

The case was referred to this Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) for submission of a Report and Recommendation regarding disposition (Dkt. 6).   As set forth below, it is recommended that the decision of the Commissioner be affirmed.

## II. PROCEDURAL HISTORY

McManus applied for Social Security Disability Insurance Benefits on April 5, 2013 and for Supplemental Security Income Benefits on April 16, 2013, both with an alleged disability onset date of May 29, 2012. (Administrative Record ("A.R.") 177-182, 183-184.)[1]   The Social Security Administration denied her application for benefits initially on May 22, 2013, and upon reconsideration on June 28, 2013. (A.R. 77-118.)   Based upon a timely request for a hearing, McManus' claims were heard before Administrative Law Judge ("ALJ") David W. Thompson on May 14, 2014. (A.R. 45-76.)   McManus was represented by counsel, and testified on her own behalf. (A.R. 50-70.)   Vocational expert Alfred Walker responded to hypotheticals presented by the ALJ, and McManus' counsel. (A.R. 70-74.)

The ALJ issued a written decision denying McManus' application for benefits on July 10, 2014. (A.R. 23-44.)   McManus timely requested a review of the ALJ's decision, and the Appeals Council denied review on October 19, 2015. (A.R. 1-6.)   Consequently, the decision of the ALJ stands as the final decision of the Commissioner. (*Id.*)

McManus filed her Complaint (Dkt. 1) before this Court on November 10, 2015. She asserts the decision is in error because she "is in all respects eligible and qualified to receive benefits under the [A]ct as amended, and the final decision of the Defendant denying benefits under the Act is not based on substantial evidence and is in error." (*Id.* ¶ 5.)   She asks this Court to reverse the decision because, *inter alia*, the restrictions to her capability to perform work as found by the ALJ were "nowhere near the extent of the limitations borne out by the medical record and testified to [by] McManus"; the ALJ erred by determining "she did not suffer proctalgia fugax, which is extremely painful and limiting"; the ALJ erred in his finding that McManus' "back

---

[1] Although McManus' application summary for disability insurance benefits refers to an application date of April 11, 2013, the disability determination explanation indicates the application for disability insurance benefits was filed April 5, 2013. (A.R. 77, 183.)

symptoms were not especially troublesome"; the ALJ's findings that McManus did not have a long history of treatment for or significant treatment problems relating to rectal difficulties is "completely contradicted" by the objective medical evidence; and McManus' doctor indicated her rectal difficulties "could potentially affect life activities" and "acknowledged her history of problems and treatment." (*Id.* ¶ 7.)

The Commissioner filed an Answer on March 9, 2016 (Dkt. 9) with a copy of the Administrative Record (Dkt. 10).   The Commissioner contends McManus has not shown "good cause" to warrant reversal under the Act, 42 U.S.C. § 405(g).

McManus filed a Memorandum in Support of Appeal (Dkt. 12) on May 9, 2016.   The Commissioner submitted a responsive Brief (Dkt. 13) on July 6, 2016.

After reviewing the written submissions, it was determined that a hearing was not warranted.   This matter is considered to be fully submitted for purposes of this Report and Recommendation.

## III. REVIEW OF ADMINSTRATIVE RECORD

This Magistrate Judge has reviewed the entire Administrative Record (Dkt. 10), but summarizes only certain portions as background for the specific issues presented by the parties. In that regard, it is noteworthy that in McManus' Memorandum she focuses on her "impairments of the colon/anus" which "include recurring anal abscesses, rectal bleeding, fistulas, anal tearing, anal papillae, anal fissures, and uncontrolled diarrhea." (Dkt. 12 p. 3.)   She claims to have lost her job as a school bus monitor due to those impairments which led to a "very high degree of absences" from work between 2009 and 2012. (*Id.* pp. 3-4; A.R. 307.)   According to McManus, her "impairments limit her ability to sit or stand for prolonged periods due to rectal pain" and require her to take unscheduled bathroom breaks and be absent from work due to her symptoms and necessary medical appointments. (*Id.* p. 4.)

**A.  Medical Records**

On December 10, 2010, McManus met with Dr. John Cromwell for evaluation of anal pain and a lump in her rectum. (A.R. 342.)   Clinical notes indicated that McManus previously suffered from lymphocytic colitis, her last colonoscopy showed no evidence of active disease, and she had a history of multiple bouts of C. difficile, for which she was on oral medication with good control of her symptoms. (A.R. 344.)   McManus reported to Dr. Cromwell that she was currently having approximately four bowel movements a day, and that she has pain with every stool. (*Id.*) McManus denied diarrhea, constipation or abdominal pain. (*Id.*)   Dr. Cromwell's examination noted a posterior anal fissure that was tender to the touch, with small anal polyps. (*Id.*)   Dr. Cromwell explained the nature of anal fissures to McManus, and directed treatment of diltiazem gel, additional daily water and fiber intake, with a follow-up in four weeks. (*Id.*)

On January 24, 2012, McManus underwent surgery to remove anal polyps. (A.R. 376.) Dr. James De Andrade performed the surgery under the direction of Dr. Cromwell. (*Id.*) McManus had reported no major changes since her previous clinic appointment, but she felt that the polyp in her anal canal had perhaps gotten larger over the last month. (*Id.*)   Otherwise, she had no changes in her bowel patterns. (*Id.*)   Surgical notes indicated that McManus tolerated the procedure well, and no complications were noted. (A.R. 377.)

On May 30, 2012, McManus was seen by Dr. Courtney Olmsted, with complaints of irritation from anal polyps. (A.R. 391.)   Dr. Olmsted noted upon exam that McManus had a new hypertrophied anal polyp, likely due to chronic issues with irregular bowel habits. (*Id.*)   Dr. Olmsted recommended stool softners, increased water and fiber intake. (*Id.*)   However, because of the discomfort it has caused her, McManus indicated that she would like to undergo excision. (*Id.*)   Dr. Olmsted, along with Dr. Cromwell, performed the excision, noting that McManus tolerated the procedure well. (A.R. 392-393.)

On August 5, 2012, McManus was seen by Dr. Olivia Bailey for complaints relating to dizziness and diarrhea. (A.R. 394-395.)   McManus reported she had diarrhea for about three weeks, going up to ten times a day, and had stools with bright red blood. (*Id.*)   Dr. Bailey took a stool sample to evaluate for C. difficile, given McManus' history. (A.R. 398.)   An outpatient consult was placed to follow-up with her diarrhea, and McManus was directed to return to the emergency department for any worsening symptoms. (*Id.*)

McManus was seen by Dr. Cromwell on January 25, 2013, reporting new discomfort in the anal region. (A.R. 421.)   McManus indicated she had some burning pain associated with bowel movements over the last few weeks, but denied any blood. (*Id.*)   She further reported no change in her bowel habits, with bowel movements approximately two to three times a day while eating a high fiber diet. (*Id.*)   Upon examination, there was no evidence of fissures or fistula. (A.R. 422.) However, it was noted that there was an enlarged polyp and slightly enlarged internal hemorrhoid. (*Id.*)   Treatment options were discussed with McManus who indicated she would like to undergo removal of the internal polyp, as well as a thorough exam under anesthesia. (*Id.*)

On April 9, 2013, McManus saw Susan Brigham, PA-C, for follow-up concerning colon issues. (A.R. 428.)   PA-C Brigham noted that McManus had a new diagnosis of diabetes, weight gain, started medications for diabetes control management, and had a return of looser stools. (A.R. 429.)   At that time, her bowel habit was irregular, but somewhat formed with the help of prescription Lomotil. (*Id.*)   Impressions were that she has a history of remote lympocytic colitis, recurrent C. difficile, recurrent anal polyps, and diabetes not controlled well. (A.R. 432.) McManus reported increased stool frequency with a decrease in consistency, possibly due to new diabetes medication. (*Id.*)   McManus was to bring in another stool sample for testing for C. difficile due to issues with the sample presented. (*Id.*)

On May 2, 2013, McManus underwent a colonoscopy performed by Dr. Konrad Schulze.

(A.R. 443.)   Dr. Schulze found no abnormalities of the ascending colon, transverse colon, descending colon or sigmoid colon. (A.R. 444.)   Dr. Schulze did observe external hemorrhoids and anal polyps on the rectum. (*Id.*)

McManus followed up with PA-C Brigham on May 21, 2013. (A.R. 450.)   PA-C Brigham noted that at the last clinic visit, McManus was found to be positive for C. difficile, and completed a 14-day course of treatment with minimal relief. (A.R. 451.)   Upon her return, the test for C. difficile was normal, and the pathology report was unremarkable, which was seen as good news. (*Id.*)   PA-C Brigham noted that McManus continues to have variable stools, but those are well controlled with Lomotil if needed. (*Id.*)   She discussed with McManus her diet, avoiding liquids with meals, and considering a gluten free diet to address these issues, as well as her diabetes management. (*Id.*)   McManus was directed to return in four to six months, and call with any questions or concerns. (A.R. 454.)

Dr. Cromwell wrote a letter dated June 3, 2013, "To Whom It May Concern" which stated as follows:

> Julie McManus has been a patient of mine since January 2011. She had previously suffered from an anal fistula as well as an anal abscess. She received a drainage tube for four months followed by the placement of an advancement flap for a fistula. Also in January, I discovered a fissure which I treated with botox injections under general anesthesia. In April 2011, anal papillae were discovered. Since then I have seen Julie for recurring pain, anal bleeding and anal papillae removals. Julie has had several surgeries due to regrowth of anal papillae. The cause of these recurring papillae is unknown as are Julie's future needs with regard to ongoing treatments. The recurring anal problems can potentially affect Julie's life activities. Julie will continue to see me as needed for future recurrences.

(A.R. 462.)

In a June 10, 2013 letter written to an attorney, PA-C Brigham stated that she first saw McManus "at the University of Iowa Hospitals and Clinics in 2008 for diarrhea and weight loss with the diagnosis of microscopic colitis/lymphocytic colitis with successful treatment, as subsequent colonoscopies have remained negative." (A.R. 461.)   PA-C Brigham also wrote that

McManus had been treated for the "repair of anal fistula and recurrent anal papillae." (*Id.*)   It was further indicated McManus "has received antibiotics in the past, and developed recurrent Clostridium difficile with diarrhea, and cramping which can be difficult to treat." (*Id.*)   PA-C Brigham also stated McManus "has had a cholecystectomy with probable bile salt diarrhea, and dumping which can contribute to looser stools." (*Id.*)   She also noted McManus "had significant weight gain with new diagnosis of Diabetes Type II." (*Id.*)

McManus saw Dr. Cromwell on July 5, 2013, reporting anal pain. (A.R. 469.)   McManus indicated that the pain is on her left side and getting worse, and she also notices blood after bowel movements. (*Id.*)   McManus reported she has had numerous bowel movements a day, with seven stools the day before her visit. (*Id.*)   She reported she took two Lomotil tablets so she could make it to the appointment. (*Id.*)   Dr. Cromwell discussed with McManus the importance of regulating her stools, and directed her to continue with the Lomotil until her diarrhea improves. (A.R. 470.)   Dr. Cromwell also discussed applying lidocaine jelly as needed for pain control in her rectum. (*Id.*)   Dr. Cromwell directed McManus to return in six weeks or sooner if symptoms worsen. (*Id.*)

McManus returned to see Dr. Cromwell on August 5, 2013 for a follow-up concerning anal fissures. (A.R. 471.)   She reported that since the last visit she had little success in getting more comfort following bowel movements. (*Id.*)   She indicated she is taking four Lomotil at a time in order to decrease the frequency of the bowel movements. (*Id.*)   Based on discussions, Dr. Cromwell indicated it sounds as if she has more diarrhea since shortly after beginning the glipizide therapy for her diabetes. (*Id.*)   McManus reported that the day before the appointment she had approximately seven loose bowel movements. (*Id.*)   She reported pain with bowel movements, and denied any prolapse of tissue from the anus. (*Id.*)   Dr. Cromwell noted on examination that there are left posterior and right posterior anal fissures. (*Id.*)   The exam also revealed no masses, proctitis or new anal polyps. (*Id.*)   Dr. Cromwell indicated that McManus continues to have issues

with loose, frequent bowel movements and diarrhea. (*Id.*)   He did note that this does respond to Lomotil if she takes enough tablets, however, she will end up constipated then afterwards. (*Id.*) McManus indicated she believes things improve on days she actually takes large amounts of fiber. (*Id.*)   Dr. Cromwell encouraged McManus to discuss with her primary doctor changing from glipizide to a different form of treatment for her diabetes. (*Id.*)   He also discussed with McManus maintaining a routine to increase the amount of fiber in her diet. (*Id.*)

On September 4, 2013, McManus saw Dr. Crowell due to ongoing issues with rectal pain, which she described as occasionally sharp or stabbing in nature. (A.R. 472.)   McManus reported an occasional small amount of blood on toilet tissue, and reported that she continues to maintain soft bowel movements with the additional water and fiber to her diet. (*Id.*)   Dr. Cromwell examined McManus, and discovered no anal fissures or fistulas, but noted some mild scarring of the anal canal consistent with her prior history of fissures. (*Id.*)   Dr. Cromwell's impressions were that McManus has levator tenderness consistent with a diagnosis of proctalgia fugax. (*Id.*)   Dr. Cromwell discussed the nature, history and treatment of the condition, and McManus indicated she would like to have a trial period of muscle relaxants to deal with these issues. (*Id.*)   Dr. Cromwell indicated that McManus should return in four to six weeks. (*Id.*)

McManus saw Dr. Cromwell on October 18, 2013 for a follow-up concerning proctalgia fugax. (A.R. 487.)   McManus reported persistent sharp rectal pain which intensifies after a bowel movement. (*Id.*)   McManus indicated she has one bowel movement per day that is soft, and occasional blood on bathroom tissue when wiping. (*Id.*)   She recently noticed a small lump in the left anal area, and requested that it be checked. (*Id.*)   Dr. Cromwell discussed options for pain management with McManus who indicated she would like to have a pain management consultation. (A.R. 488.)

On November 24, 2013, McManus saw Dr. Muneera Kapadia for consultation concerning

her rectal pain. (A.R. 489.)   Dr. Kapadia noted that McManus has a new onset of pain on the left side with bowel movements and with wiping. (*Id.*)   McManus reported she has one to two bowel movements per day, and is taking a fiber supplement. (*Id.*)   Dr. Kapadia noted, upon examination, that McManus has persistent proctalgia fugax, and new rectal pain on her left side that is consistent with that diagnosis. (A.R. 491.)   Dr. Kapadia recommended McManus try biofeedback once per month for three to four sessions, keep her appointment with the pain clinic for next July, and follow-up with Dr. Cromwell for any future concerns. (*Id.*)

On December 30, 2013, McManus saw Dr. John Byrn for rectal bleeding. (A.R. 492.) McManus reported that she had an episode of increased blood in her rectum on Christmas evening and, although she feels better now and has not had another episode of bleeding, it was larger in volume that was typical. (*Id.*)   Dr. Byrn examined McManus and indicated she should continue to monitor the circumstances and follow-up with Dr. Cromwell. (*Id.*)

McManus saw Dr. Mark Graber on January 3, 2014, complaining of blood when she was wiping herself after a bowel movement. (A.R. 512.)   McManus reported to Dr. Graber that on Christmas day she had a large amount of blood following a bowel movement, and this occurred again the day prior to her appointment when she had more blood than usual. (*Id.*)   Dr. Graber examined McManus and determined she had no blood in her rectum, but there was a small fissure with a small amount of blood. (A.R. 516.)

McManus completed an "Incontinence Questionnaire" in January, 2014. (A.R. 498-501.) McManus indicated she has lymphocytic colitis that was diagnosed in 2008. (A.R. 498.) McManus further indicated that she suffers incontinence two to three times a week during the day and night, and that she has cramps and abdominal pain and an urge to defecate. (*Id.*)   Further, she indicated that her bowels move approximately three to four times per day. (*Id.*)   McManus indicated she typically has a small or moderate amount of stool at each bowel movement, and

incontinence can be brought on by stress, nervousness, and active exercise. (A.R. 499.)   McManus reported that finding a bathroom is a problem because when she feels the urge to go she is given little warning and has to go immediately. (A.R. 501.)   McManus further indicated she has pain in her rectum due to proctalgia fugax and scar tissue from previous anal repair surgeries. (*Id.*)

McManus also completed a "Health Status Survey" in January, 2014. (A.R. 502-511.) McManus indicated she is having more problems living a normal and functional life as she is always in pain from rectal bleeding or proctalgia fugax. (A.R. 502.)   McManus expressed that she feels that her physicians are tired of her, so they refer her to the pain clinic rather than helping her deal with the pain. (*Id.*)   She further expressed that her physicians want her to see a psychiatrist to deal with the pain, and that none of her doctors want to give her anything to deal with the pain. (*Id.*)   McManus indicated that since 2008 her health has gotten much worse. (A.R. 506.)   She has lymphocytic colitis, and needs to be near a restroom at all times. (*Id.*)   She has had several surgeries for fistulas, abscesses, fissures and regrowth of polyps, and is now diagnosed with having proctalgia fugax, which is chronic anal pain. (*Id.*)   She further indicated she was diagnosed with diabetes, and was doing better exercising. (*Id.*)   However, her anal pain became worse because the physicians will not give her pain medications as they fear she would be constipated from them. (*Id.*)   McManus indicates she has chronic diarrhea, and she is always in pain, so it is hard to live a normal life. (*Id.*)

McManus saw Dr. Cromwell again on January 22, 2014, and reported her bleeding has persisted, but was not always associated with pain. (A.R. 518-519.)   She received biofeedback recently, and reported to Dr. Cromwell that it made her pain worse. (A.R. 518.)   Dr. Cromwell noted McManus denies constipation or diarrhea, and examination showed a right anterior internal hemorrhoid. (A.R. 519.)   Dr. Cromwell planned to band the internal hemorrhoid, and encouraged McManus to keep her upcoming biofeedback appointments and her pain clinic appointment. (*Id.*)

On January 27, 2014, McManus met with Dr. Esther Benedetti for assessment of chronic pain. (A.R. 524.)   McManus reported to Dr. Benedetti that she is being told that further surgical intervention will not reduce her symptoms, and that she should continue physical biofeedback. (*Id.*)   Dr. Benedetti concluded McManus would be an excellent candidate for a ganglion impar block, however, she is only four days from a hemorrhoid banding, and believed it would be beneficial to wait approximately six weeks to allow swelling to reduce, and infection and risks to decrease. (A.R. 530.)   Dr. Benedetti further advised McManus to discontinue her biofeedback due to an increased risk of inflammation and exacerbation of pain. (*Id.*)   The plan was to proceed with the ganglion impair block in approximately six weeks. (*Id.*)

McManus proceeded with the ganglion impar block procedure on March 24, 2014. (A.R. 540.)   Dr. Benedetti indicated McManus tolerated the procedure well, and the procedure was performed without any complications. (*Id.*)   McManus was directed to return in three months for reevaluation of pain, and a possible repeat procedure. (A.R. 552.)

McManus met with Dr. Shalina Shaik on March 31, 2014, reporting significant pain from the recent ganglion impar block procedure. (A.R. 554.)   McManus reported she had back pain from the procedure and could not get out of bed for a day after the procedure. (*Id.*)   McManus also indicated that when she sneezes or goes to the bathroom she has intense pain that takes her breath away. (A.R. 555.)   She reported she takes Lomotil for chronic diarrhea, only if she has bad diarrhea, and has not taken the Lomotil for approximately three weeks. (*Id.*)

McManus saw Dr. Cromwell on April 11, 2014, because she felt a bump inside her anal canal. (A.R. 562.)   She reported she has some pain, which she believes is the prior injection site from the pain clinic, but is gradually improving. (*Id.*)   An exam showed no evidence of fistula or fissures, and some scar tissue and scarring noted in the anal canal, but no anal polyps. (*Id.*)   Dr. Cromwell noted McManus appears to have some minor irritation of the anal canal causing some

12

swollen scar tissue, but he did not find any evidence of any serious issue. (*Id.*)   McManus was to follow-up with Dr. Cromwell as needed. (*Id.*)

In addition to her medical problems related to the rectum and anus, McManus has been treated for depression and anxiety through March, 2014. (A.R. 542.)   McManus sees therapist Larry Flesburg, and has seen nurse practitioner Kathryn Griffith and Dr. Todd Pogue since early 2011. (*See* A.R. 316-341, 439-442, 536-539 & 542-544.)   It is generally noted that McManus has an Axis I diagnosis of generalized anxiety disorder, panic disorder without agoraphobia and obsessive compulsive disorder by history. (*Id.*)   McManus is prescribed Xanax for anxiety, Ambien and Seroquel for insomnia, and Zoloft for her general anxiety and depression. (*Id.*) McManus reports her medications generally are working well, she does not have side effects, and sleeps well. (*Id.*)   Overall McManus has done fairly well, her mood has been decent, and she has been sleeping well. (*Id.*)   Although her mood may vary depending upon other issues that may be going on in her life, she is generally noted as being well dressed and well groomed, pleasant and cooperative with linear thoughts and goal-directed thoughts, denies suicidal or homicidal ideation, denies hallucinations, has good insight and judgment, intact memory and concentration, and a full affect and full orientation. (*Id.*)   The general plan over the course of her mental health treatment has been to continue with her current medications, and to contact the therapists or doctors if suicidal or homicidal ideation or other serious symptoms develop. (*Id.*)

## B. Functional Capacity Assessment

PA-C Brigham completed a Crohn's and Colitis Residual Functional Capacity Questionnaire, dated September 23, 2013. (A.R. 483-486.)   PA-C Brigham indicated she has had two to three clinic visits per year with McManus since November 2008, and that McManus has a diagnosis of recurrent C. difficile and lymphocytic colitis. (A.R. 483.)   Utilizing check boxes, PA-C Brigham identified McManus' symptoms as chronic diarrhea, bloody diarrhea, abdominal pain

and cramping, abdominal distention, fistulas and anal fissures. (*Id.*)   McManus has a work-up of pain systems consistent with the diagnosis, rectal pain after bowel movements, and has been given medications for the symptoms. (*Id.*)   She reported McManus has stooling and associated pain episodes six to seven times per day, but this may be less frequent when medication is taken. (A.R. 484.)   PA-C Brigham further noted that the clinical findings are consistent with the diagnosis of proctalgia fugax, lympocytic colitis, recurrent C. difficile and increased frequency of stooling and urgency. (*Id.*)

PA-C Brigham checked boxes indicating that McManus' impairments can be expected to last at least 12 months, and the impairments are reasonably consistent with the symptoms and functional limitations described in the evaluation. (A.R. 484.)   She believes McManus is incapable of even low stress jobs due to symptoms, which she characterized as flairs, and the frequency of episodes, and McManus is unable to work during an occurrence of symptoms. (A.R. 485.)   She estimated McManus can walk six city blocks, she can sit 15 minutes at a time, she can stand 45 minutes at a time, and she can sit and stand less than two hours in an eight-hour work day. (*Id.*)   PA-C Brigham further estimated McManus will need to take unscheduled restroom breaks three to four times during an eight-hour working day for 10 to 15 minutes at a time, with no advance notice of having the need for a restroom break. (*Id.*)   Further, she estimated McManus will need to lie down or rest at unpredictable intervals two to three times for approximately 30 minutes at a time during an eight-hour work day. (A.R. 486.)   PA-C Brigham further estimated that McManus would likely be absent from work as a result of the impairments or treatment more than four days per month. (*Id.*)   She described the limitations affecting McManus' ability to work at a regular job on a sustained basis as recurrent polyps, requiring frequent surgical intervention, recurrent anal fissures, muscle spasms, and uncontrolled diarrhea requiring frequent bathroom breaks. (*Id.*)

In response to a question on the form "[i]s your patient a malingerer?"  PA-C Brigham checked a box labeled "Yes." (A.R. 484.)   However, in a subsequent letter from PA-C Brigham dated June 2, 2014, she specifically indicates that she does not consider McManus to be a malingerer. (A.R. 564.)

## C.   Testimony of Julie A. McManus

McManus presented testimony to the ALJ on May 14, 2014. (A.R. 50-70.)   At that time, she was 43 years of age, 5'4" tall, and weighed 192 lbs. (A.R. 50.)   McManus indicated that recently she has put on a fair amount of weight, very quickly. (A.R. 50-51.)   McManus does not have any children, and resides with both of her retired parents in their home. (A.R. 51, 53.)   She is a high school graduate. (A.R. 55.)   In 2007, McManus had a back injury while working for which she received workers compensation benefits for approximately one year. (A.R. 54.)

McManus received unemployment benefits after she was fired in May 2012, which is the last time she was employed. (A.R. 54-55.)   According to McManus, she was terminated for missing too many days of work. (A.R. 56.)   She attributed this to the need to take multiple bathroom breaks, and to her medical procedures and surgeries. (*Id.*)   During the period of time she was receiving unemployment benefits, she was actively looking for work. (A.R. 69.)   However, McManus believes that within four weeks of beginning a job she likely would be fired because of the time she would need to miss from work to deal with her rectal difficulties. (*Id.*)

McManus does have a driver license, but she has not driven for approximately three months. (A.R. 58.)   She testified that she does not go many places. (*Id.*)   To attend the hearing, McManus rode in a car for approximately 45 minutes without any stops or breaks. (A.R. 53.)   McManus is able to take care of her personal hygiene needs, including bathing herself and dressing herself. (A.R. 58.)   However, she does not cook for herself because she is not able to stand for that long. (*Id.*)   McManus smokes less than one pack of cigarettes per day. (*Id.*)

From 2010 to the time of the hearing she has had at least four colonoscopies. (A.R. 59.) McManus testified that she had a combination of nine visits to the doctor, the emergency room, or for surgery relating to rectal difficulties in 2010, eight in 2011, six in 2012, nine in 2013 and seven in 2014 through the date of the hearing. (A.R. 59-60.)   McManus stated she has diarrhea constantly. (A.R. 60.)   When she was working as a bus monitor for the school district, she would often soil her pants, and have to go home for the day to clean up. (*Id.*)   McManus indicated she would need to use the restroom six to seven times a day, up to 11-12 times per day. (A.R. 61.) According to McManus, no matter the medication she takes to address the issue, she cannot stop the diarrhea. (*Id.*)   McManus also noted she suffers from recurrent C. difficile, which are bad infections in her colon. (*Id.*)   McManus testified she also had a significant amount of pain because of growths of polyps in her rectum that she had to have surgically removed. (A.R. 60.)

As described by McManus, since May of 2012 these issues have become progressively worse, and medical professionals have no explanation. (A.R. 62.)   For the last five to six months McManus indicated she typically uses the bathroom six to seven times a day, and nine to eleven times per day on bad days. (*Id.*)   McManus suffers pain from these issues, has muscle spasms and rectal pain after every bowel movement because there is a significant amount of scar tissue in her rectum. (A.R. 62-64.)   McManus lays down to alleviate the pain she experiences. (A.R. 63.) McManus believes this increased significantly after her last surgery for removal of a polyp. (*Id.*)

McManus would wear diapers in order to deal with her rectal difficulties and attempt to work. (A.R. 65.)   However, the diapers would not always control the problem, which led to difficulties and embarrassment. (A.R. 65-66.)   The pain she deals with from her rectal problems affects her ability to concentrate, to pay attention, and to stay on task. (A.R. 66.)   McManus indicated that she has to lie down on a daily basis to deal with these issues and her pain. (A.R. 67.) In the last two years she had a period of a couple of weeks when she felt better, but she is unsure

why. (*Id.*)   During that time period she was actually able to exercise on the treadmill but soon developed another polyp that needed to be removed. (A.R. 67-68.)   As explained by McManus, the pain has become worse over the last two years because she has had more surgeries, due to the surgeries she has a significant amount of scar tissue, and due to the scar tissue her bowel movements are more painful than they were previously. (A.R. 67.)

McManus takes a number of medications, but in her opinion, they are not effective for her. (A.R. 56-57.)   She continues to take the medications even though she does not believe they work because this is all that her doctors offer her to treat her conditions. (*Id.*)   She indicated that a few of the medications do work, but she believes her physicians are tired of dealing with all of her rectal problems. (A.R. 57.)   According to McManus, some of the medications have fairly bad side effects, but she continues to take them because she does not want to have problems with her doctors. (*Id.*)

McManus also testified about her treatment for mental health issues, including anxiety, panic disorder and obsessive compulsive disorder. (A.R. 64-65.)   McManus takes medications to deal with these issues, and believes the medications do help with these problems. (A.R. 65.)

## D.  Function Reports

McManus' mother, Bonnie McManus, completed a Third-Party Function Report, dated April 16, 2013. (A.R. 233-242.)   Mrs. McManus indicated that McManus is no longer able to keep a job, does not visit with friends very often outside of the home and does not exercise regularly. (A.R. 235-236.)   She further reported that McManus is unable to keep a job because of needing time off for surgeries and for pain following those procedures. (A.R. 235.)   Her mother further indicated that McManus is able to prepare daily meals for herself, except that she prepares them if McManus has pain. (A.R. 237.)   McManus is able to do her laundry, able to drive on her own, able to go out on her own, shops for groceries, pays her bills, handles her checkbook, watches

T.V., plays cards, talks on the phone, and texts with individuals daily. (A.R. 237-239.)

Mrs. McManus indicated that McManus' ability to walk, stand, and sit are affected by rectal pain and diarrhea, but that she has no problem paying attention, following written or spoken instructions, or getting along with authority figures. (A.R. 240-241.)   She further reported that McManus is a changed person because of the fact that she is unable to hold a job. (A.R. 242.)   She has had constant medical procedures and follow-ups and, in Mrs. McManus' opinion, no employer will allow that much time off from work. (*Id.*)   In her view, there appears to be no end in sight to her daughter's conditions. (*Id.*)

McManus herself also completed two function reports during the course of these proceedings, with the latest dated June 17, 2013. (A.R. 266-274.)   She indicated that she was let go from her last job in May 2012 due to tests, rectal surgeries and recurring growths in her rectum. (A.R. 267.)   She believes she could not hold a job because she was having surgeries for polyp regrowths every four months. (*Id.*)   She indicated the pain never stops, and she needs to be near a toilet due to diarrhea that requires her to use the bathroom 10 to 20 times per day. (*Id.*)

McManus also indicated that her daily activities includes going to the bathroom, taking medications and resting on her side which relieves her pain. (A.R. 268.)   McManus further reported she used to be able to work, drive and exercise, as well as having bowel movements without pain, but now she constantly worries about her health, and has to take medications, including sleep aids and anxiety medication. (*Id.*)   In terms of personal care, she does dress herself, but she stays in her nightgown throughout the day, and she has no problem bathing nor caring for her hair, but she is not always able to get to the bathroom in time which will cause her to have an accident in her pants. (*Id.*)   According to McManus, her mother prepares her meals, because she cannot stand long enough without having a throbbing pain in her rectum. (A.R. 268, 270.)   She does not do yard work because she cannot stand long enough, and will have throbbing

pain. (A.R. 268-269.)   McManus is able to drive a car, ride in a car, pay bills, count change, and handle a savings account, but indicated to use a checkbook is too confusing. (A.R. 269.)

McManus' social activities have changed because she needs to be near a bathroom, so she most often communicates by phone. (A.R. 271.)   Her physical activities are limited in that she believes she has a 20-pound lifting restriction because anything else will cause a throbbing, stinging pain and bleeding in her rectum. (*Id.*)   As for abilities affected by her conditions, she checked boxes for lifting, squatting, standing, reaching, walking, sitting, kneeling and stair climbing. (*Id.*)   She reported she is not able to walk longer than a block without needing a rest, but she can finish activities, follows written and spoken instructions well, and can handle money. (A.R. 271-272.)   McManus indicated she watches T.V. and talks on the phone daily, including to her parents and her friends. (A.R. 272.)   She is diabetic, and has consulted with a liver specialist and hematologist. (A.R. 274.)

McManus also completed a Pain and Fatigue Questionnaire dated June 18, 2013. (A.R. 275-278.)   McManus indicated she has severe pain in her rectum before, during and after bowel movements, lasting all day. (A.R. 276.)   She described the pain as mostly sharp and sometimes aching, and after bowel movements she has to lay down as it is too painful for her to sit or walk. (*Id.*)   She indicated this occurs daily, lasts all day, and became worse over the last 12 months. (*Id.*)   She further indicated the pain limits her ability to exercise, go out, sit for periods of time, wear clothing that is too tight, and requires her to stay near a toilet. (A.R. 277.)   According to McManus, she is limited in working, driving, cooking and preparing meals, shopping and visiting friends and family. (*Id.*)   She sleeps a lot and uses sleeping pills because it is the only time she is not in pain. (*Id.*)   Further, she has gained weight because of inactivity from this chronic pain. (*Id.*)

**E.   Testimony of Vocational Expert**

A vocational expert ("VE"), Alfred Walker, also testified at the hearing on May 14, 2014.

(A.R. 70-74.)   The ALJ presented an initial hypothetical for an individual of McManus' age, (43 years of age as of the alleged disability date and 44 years of age as of the hearing date), a high school education and the same work experience, who is limited to sedentary work, limited to occasional postural activities, but no ropes, ladders or scaffolds. (A.R. 70-71.)   The VE testified that such an individual would not be able to perform McManus' past work. (A.R. 71.)   However, the VE testified that there would be jobs in the state of Iowa that such an individual could perform, including someone who is a ticket checker, charge account clerk and telephone quotation clerk.

(*Id.*)   The ALJ modified the hypothetical to include that

> because of the individual's mental impairments, and all impairments, and their symptoms combined, the individual may, during times of symptoms' exacerbation, have moderate limitations in, one, concentration, persistence, and/or pace, or in attempting complex or detailed tasks. So, the individual is limited to jobs that do not require complex or detailed job processes, little in the way of change in job process from day to day, jobs that can be learned in 30 days or fewer, and jobs with multistep self-evident tasks easily resumed after a momentary distraction; and, two, social functioning, so the individual is limited to jobs that do not require more than occasional work-related interaction with the public, coworkers, and supervisors.

(A.R. 71-72.)   The VE responded that the individual could still work as a ticket checker, however, a telephone quotation clerk and charge account clerk requires more than occasional dealing with the public and, therefore, those jobs would not be available. (A.R. 72.)   But other jobs would be available with the additional limitations, including cutter, paster and document preparer. (*Id.*)   The VE explained this was not an exhaustive list of jobs available, but rather a sampling. (*Id.*)

The ALJ then asked whether missing four or more days of work per month would have an impact on employability. (*Id.*)   The VE opined that an individual that is absent on such a basis could not maintain full-time employment. (*Id.*)   Additionally, the ALJ asked the VE to consider if the individual would need to take extra breaks during the day, such that they are less than 80 percent productive on the job. (*Id.*)   Based on productivity at that level, the VE testified that such an individual could not maintain full-time employment. (A.R. 72-73.)

McManus' attorney presented the VE with additional modifications to the hypothetical. He asked the VE if a person needs to use the restroom or lie down two to four times on unscheduled occasions for approximately 10 to 30 minutes each time, whether that describes an individual who is less than 80 percent productive in employment. (A.R. 73-74.)   The VE responded affirmatively, and indicated that such breaks in work would not be tolerated by employers. (A.R. 74.)

## F.   Findings of Administrative Law Judge

Administrative Law Judge David Thompson entered a written decision (A.R. 23-44) on July 10, 2014, setting forth the following findings of fact:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

2. The claimant has not engaged in substantial gainful activity since May 29, 2012, the alleged onset date (20 CFR 404.1571 *et seq.,* and 416.971 *et seq.*).

3. The claimant has the following severe impairments: diabetes, post anal sphincter surgery, disorders of the back, and obesity (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 40 4.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: the claimant is limited to occasional postural activities with no crawling or climbing of ladders, ropes, or scaffolds.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on October 15, 1970 and was 41 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills

(See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 29,2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(A.R. 28-39.)   ALJ Thompson concluded:

Based on the application for a period of disability and disability insurance benefits filed on April 5, 2013, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.

Based on the application for supplemental security income filed on April 16, 2013, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(A.R. 39.)

# IV. JUDICIAL REVIEW OF DECISION

## A.  Standard of Review

When performing judicial review, "[t]he court's task is to determine whether the ALJ's decision 'complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'" *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010) (quoting *Ford v. Astrue,* 518 F.3d 979, 981 (8th Cir. 2008)); *see also, e.g., Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011) (court "'will affirm the ALJ's findings if supported by substantial evidence on the record as a whole'") (quoted citations omitted)).   "Substantial evidence 'is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009)); *see also Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L.Ed. 2d 842 (1971) (Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

(quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938))).

The "court must consider evidence that supports and detracts from the ALJ's decision," but "'[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Cuthrell v. Astrue*, 702 F.3d 1114, 1116 (8th Cir. 2013) (quoting *Perkins*, 648 F.3d at 897). Thus, "[e]ven if substantial evidence supports a contrary outcome, [the court] may not reverse so long as the Commissioner's decision also is supported by substantial evidence." *Randolph v. Barnhart*, 386 F.3d 835, 839 (8th Cir. 2004). Stated in other words, the court

> will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the court] might have reached a different conclusion had [it] been the initial finder of fact.

*Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008) (internal quotations and citations omitted)). The court may reverse the ALJ's decision if it is based on legal error. *Neal v. Barnhart*, 405 F.3d 685, 688 (8th Cir. 2005); *Lauer v. Apfel*, 245 F.3d 700, 702 (8th Cir. 2001). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (internal citations omitted).

Under the applicable law, a claimant is disabled if he is unable "'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting 42 U.S.C. § 1382c(a)(3)(A)); *see also* 42 U.S.C. § 416(i). "The [Social Security Administration] has established a five-step sequential process for evaluating disability claims." *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011).

Step one determines whether the claimant is involved in substantial gainful activity. §§ 404.1520(a)(4)(i),(b); 416.920(a)(4)(i),(b). If so, the claimant is not disabled; if not, step two determines whether the claimant has a "severe" medically determinable impairment (or combination of impairments). §§ 404.1520(a)(4)(ii), (c); 416.920(a)(4)(ii),(c). If there is no severe impairment, the claimant is not disabled; if there is, step three determines whether the impairments are severe enough to meet a predetermined list of conditions (with duration requirements). §§ 404.1520(a)(4)(iii),(d); 416.920(a)(4)(iii),(d). If so, the claimant is disabled; if not, step four considers the residual functional capacity of the claimant - previously determined by the ALJ - and evaluates whether the claimant has the residual functional capacity to complete his or her past relevant work. §§ 404.1520(a)(4)(iv),(f); 416.920(a)(4)(iv),(f). If the claimant can complete past relevant work, the claimant is not disabled; if not, step five considers the claimant's residual functional capacity, age, education, and work experience to determine whether the claimant can do other work. §§ 404.1520(a)(4)(v),(g); 416.920(a)(4)(v),(g). If so, the claimant is not disabled; if not, the claimant is disabled.

*Cuthrell*, 702 F.3d at 1116-17; *see also Jimmerson v. Astrue*, 717 F.Supp.2d 840, 856 (S.D. Iowa 2010) (setting forth five-step evaluation).

**B.   Analysis of McManus' Arguments**

The written decision entered by ALJ Thompson in this case followed the five-step framework.   McManus contends, however, the ALJ erred at certain steps in denying her claim for disability benefits and supplemental security income.   Primarily, as presented in her Memorandum, McManus argues the assessment of her residual functional capacity was erroneous because the ALJ failed to incorporate limitations related to prolonged sitting and the need for frequent, unscheduled bathroom breaks and absenteeism from work.   As part of this analysis, McManus contends the ALJ improperly discredited her own subjective complaints relating to those limitations and erroneously discounted the opinions of her treating physician's assistant, PA-C Susan Brigham.   In addition, McManus argues the Commissioner has not sustained her burden of proving other work exists in the economy which McManus can realistically perform.

After considering the arguments of McManus, and upon an independent review of the Administrative Record, this Magistrate Judge finds there are insufficient grounds for reversal of

the ALJ's decision.   Instead, the decision appears to comply with the requisite law and is supported by substantial evidence.   Although there is also evidence in the record supporting the arguments of McManus, the ALJ's decision falls within the available zone of choice and, therefore, should not be disturbed by this Court.

### 1.   Determination of Residual Functional Capacity

McManus asserts the ALJ's determination of residual functional capacity,   "containing no limits in sitting and failing to address absenteeism or any need to take bathroom breaks," is not supported by substantial evidence. (Pl.'s Mem. pp. 16-37.)   When determining whether a claimant can engage in substantial employment, the ALJ must consider the combination of the claimant's mental and physical impairments and determine the claimant's residual functional capacity ("RFC"). *Masterson v. Barnhart,* 363 F.3d 731, 737 (8th Cir. 2004); *Baldwin v. Barnhart,* 349 F.3d 549, 556 (8th Cir. 2003).   It is a function-by-function assessment of an individual's ability to do work-related activities despite his or her physical or mental limitations. *See, e.g., Page v. Astrue,* 484 F.3d 1040, 1043 (8th Cir. 2007); *Roberson v. Astrue,* 481 F.3d 1020, 1023 (8th Cir. 2007); *Harris v. Barnhart,* 356 F.3d 926, 930 (8th Cir. 2004); *Depover v. Barnhart,* 349 F.3d 563, 565 (8th Cir. 2003).   In other words, "[a] claimant's RFC represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence." *McCoy*, 648 F.3d at 614; *see also Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011); 20 C.F.R. § 404.1545.

Residual functional capacity "is a medical question and 'at least some' medical evidence must support the ALJ's RFC determination." *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010) (quoting *Lauer*, 245 F.3d at 704); *see also Martise*, 641 F.3d at 923.   "[I]t is the responsibility of the ALJ, [however,] not a physician, to determine a claimant's RFC." *Boyd v. Colvin*, 831 F.3d 1015, 1020 (8th Cir. 2016).   "The ALJ must assess a claimant's RFC based on all relevant,

credible evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005) (internal citations and quotation marks omitted); 20 C.F.R. §§ 404.1545, 416.945 ("We will assess your residual functional capacity based on all the relevant evidence in your case record.").

"The ALJ bears the primary responsibility for determining a claimant's RFC . . . . However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." *Martise*, 641 F.3d at 923 (citation and internal quotation marks omitted); *see also Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2016) ("The claimant has the burden to establish [her] RFC."); *Moore*, 572 F.3d at 523 ("The claimant has the burden of proof to show she is disabled through step four."); *Baldwin*, 349 F.3d at 556 ("It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC.").

In this case, ALJ Thompson found McManus "has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: the claimant is limited to occasional postural activities with no crawling or climbing of ladders, ropes, or scaffolds." (A.R. 31.)  This determination was supported by a thorough written review of the evidentiary record including the hearing testimony of McManus, the statements of her mother, and the medical records including the various visits with Dr. Olmsted (May 2012), Dr. Ismail (September 2012, November 2012, March 2013), Dr. Cromwell (January 2013, July 2013, August 2013, September 2013, October 2013, January 2014, April 2014), Dr. Kapadia (November 2013), Dr. Benedetti (January 2014, March 2014) and PA-C Brigham (April 2013, May 2013, January 2014). (*See* A.R. 31-37.)   ALJ Thompson also explicitly considered the medical opinion evidence provided by agency doctors in May and June of 2013, by Dr. Cromwell in the June 2013 letter, and by PA-C Brigham in her answers to the Crohn's & Colitis Residual Functional Capacity

Questionnaire dated September 23, 2013. (*See* A.R. 36-37.)   As such, the decision clearly establishes that the ALJ's assessment of McManus' residual functional capacity was properly based on all the relevant evidence in the case record. *See Goff*, 421 F.3d at 793; 20 C.F.R. §§ 404.1545, 416.945.

McManus contends, however, that her RFC should contain limits to prolonged sitting and account for frequent, unscheduled bathroom breaks and absenteeism from work. (Pl.'s Mem. p. 16.)   In her view, "[t]he medical record overwhelmingly supports [her] statements that she must take frequent bathroom breaks and that she cannot sit for prolonged periods" and "fully supports her frequent absences due to the need to visit the hospital as well as the effects of her anal symptoms." (*Id.* p. 17.)   McManus argues the inclusion of those additional limitations to her RFC would render her unemployable based on the Commissioner's regulations and testimony of the vocational expert. (*Id.* p. 18.)

As reflected in both the ALJ's decision and the summary of the record by this Magistrate Judge above, the Administrative Record does contain evidence supporting McManus' claims of difficulty with sitting and need for unscheduled bathroom breaks and absenteeism due to her symptoms.   But "'[t]he mere fact that some evidence may support a conclusion opposite to that reached by the Commissioner does not allow this Court to reverse the decision of the ALJ." *Johnson v. Colvin*, 788 F.3d 870, 873 (8th Cir. 2015) (quoting *Johnson v. Barnhart,* 390 F.3d 1067, 1070 (8th Cir. 2004)).   Moreover, the objective medical records fall short of "overwhelmingly" and "fully" supporting the alleged extent and severity of the limitations characterized by McManus.   Instead, the evidence supporting the inclusion of the additional limitations in the RFC as urged by McManus comes primarily from her own subjective complaints, the statements of her mother, and the responses of PA-C Brigham in the September 23, 2013 Questionnaire.   ALJ Thompson, however, discredited and discounted the evidence.

**a. Assessment of McManus' Subjective Complaints**

As set forth in the written decision, ALJ Thompson considered but discredited McManus'

subjective complaints:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

(A.R. 32.)   Similarly, in regard to the statements of McManus' mother, the ALJ stated:

> The undersigned has also considered the statement of Bonnie McManus, the claimant's mother (Exhibit 4E). For the reasons discussed above as to finding the claimant's statements to be less than fully credible, the undersigned finds her statements concerning the intensity, persistence and limiting effects of the claimant's symptoms are not consistent with the objective medical record, the claimant's actual activities, and her self-reports to her doctors, and are therefore not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(A.R. 37.)

McManus contends the ALJ's assessment of her credibility is erroneous and not supported

by substantial evidence. (Pl.'s Mem. pp. 38-40.)   She argues that ALJ "Thompson erroneously

relied on the lack of objective medical evidence to discount [her] allegations of rectal pain,

diarrhea, and the limitations that resulted from those impairments." (*Id.* p. 38.)   She further asserts

that "[n]ot only did Judge Thompson err in failing to assess any of the *Polaski* factors, his

credibility assessment is not supported by substantial evidence." (*Id.*)

In response, the Commissioner insists ALJ Thompson properly evaluated McManus'

credibility by considering inconsistencies between her subjective complaints and the objective

evidence. (Def.'s Brief p. 13.)   Noting that an ALJ is not required to explicitly discuss each factor,

the Commissioner contends ALJ Thompson properly considered the *Polaski* factors in this case

and provided sufficient reasons for discounting McManus' subjective complaints. (*Id.*)   In the

Commissioner's view, substantial evidence in the record as a whole supports the ALJ's assessment

and, consequently, "this Court should affirm the ALJ's decision [McManus] was not credible to the extent she claimed she was disabled." (*Id.* p. 14.)

As cited by both parties, factors for evaluating a claimant's subjective complaints were set forth by the Eighth Circuit in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984).

> [T]he ALJ must consider the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions. Another factor to be considered is the absence of objective medical evidence to support the complaints, although the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence.

*Jones v. Astrue*, 619 F.3d 963, 975 (8th Cir. 2010) (internal citations and quotations omitted); *see also Renstrom*, 680 F.3d at 1065-66 (setting forth *Polaski* factors); *Buckner*, 646 F.3d at 558.   The Commissioner correctly notes that "[t]he ALJ is not required to discuss each *Polaski* factor as long as he acknowledges and considers the factors before discounting a claimant's subjective complaints." *Jones*, 619 F.3d at 975; *see also Ford*, 518 F.3d at 982 ("The ALJ had to consider these matters, but did not have to discuss each one of them in relation to [the claimant], and he was permitted to discount her complaints if they were 'inconsistent with the evidence as a whole.'").   In addition, the Eighth Circuit recently explained that

> [a]n ALJ may discredit any subjective allegations that cannot reasonably be expected to flow from an established, medically determinable impairment. 20 C.F.R. § 404.1529(b). Once a claimant has demonstrated the existence of an impairment that could reasonably be expected to produce the alleged symptoms, the question becomes whether the claimant's subjective allegations regarding the extent of her symptoms are credible. *See id.* §§ 404.1528, 404.1545(e). The ALJ must consider the consistency of the evidence, and consider information provided by the claimant, her doctors, and others with knowledge of her circumstances. *Id.* § 404.1529(c); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).

*Aguiniga v. Colvin*, 833 F.3d 896, 902 (8th Cir. 2016).   "The ALJ may properly discount the claimant's testimony where it is inconsistent with the record." *Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir. 2011) (citing *Eichelberger v. Barnhart,* 390 F.3d 584, 590 (8th Cir.2004)).

Where an ALJ seriously considers but for good reasons explicitly discredits a claimant's

subjective complaints, the court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001); *Buckner*, 646 F.3d at 558.   "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Igo v. Colvin*, 839 F.3d 724, 731 (8th Cir. 2016) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)); *Bradley*, 528 F.3d at 1115 (same).   Thus, courts "'defer to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Mabry*, 815 F.3d at 389 (quoting *Johnson v. Colvin*, 788 F.3d at 872 (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006))); *see also Hamilton v. Astrue*, 518 F.3d 607, 613 (8th Cir. 2008) (quoting *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006) (quoting *Guilliams v. Barnhart,* 393 F.3d 798, 801 (8th Cir.2005))); *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006).   The ALJ is required, however, to "'detail the reasons for discrediting the testimony and set forth the inconsistencies found.'" *Ford,* 518 F.3d at 982 (quoting *Lewis v. Barnhart,* 353 F.3d 642, 647 (8th Cir. 2003)); *Guilliams*, 393 F.3d at 802 (same).

Here, the ALJ's credibility assessments appear to be supported by good reasons and substantial evidence.   ALJ Thompson conducts a fairly in-depth analysis and explanation which sufficiently details the reasons for discrediting the subjective limitations expressed by McManus, and her mother, and sets forth inconsistencies found in the record.   After summarizing the medical records, the ALJ concluded that McManus' "allegation of complete and total disability cannot be fully accepted" and explained as follows:

> Despite the objective findings noted above, the medical record does not support the allegation of an inability to perform all work activity. The claimant does have impairments that can be anticipated to produce a certain amount of limitations. However, the claimant's anal impairments, diabetes, back disorder, and obesity are not totally disabling.

> The claimant does have a history of back pain, and underwent back surgery in 2007 (Exhibit 2F, 20). However, the record shows no treatment for any back pain since her alleged onset date. She has not undergone any injections, surgeries, or physical therapy for her back since her alleged onset date. She has not had any ER visits for

back pain since her alleged onset date. This suggests that her back symptoms were not especially troublesome. She retains 5/5 strength of all extremities and the ability to walk with a normal gait (Exhibit 14F, 10). She has been limited to sedentary work, with only occasional postural activities to account for her history of back pain and obesity, but has not demonstrated how it would preclude all work activity.

The claimant also has been diagnosed with diabetes, but the record does not show it is completely disabling. She has not been diagnosed with having any complications as a result of her diabetes, including acidosis, neuropathy, visual impairments, vascular complications, or renal complications. There is no record of any ER visits or hospitalizations for blood sugar issues, nor did the claimant complain of any hypo or hyperglycemic episodes to her doctor. While her diabetes was initially noted to be uncontrolled with high glucose readings (Exhibit 2F, 81-86), she later reported good glucose control even with lowering her glipizide dosage because she had been exercising and eating high fiber cereal (Exhibit 8F, 3). The claimant has been limited to sedentary work activity that does not require climbing ladders ropes, or scaffolds to account for this condition.

The medical record also reflects a long history of treatment for various anal issues, including papillae, hemorrhoids, surgeries, anal pain, and diarrhea. However, the medical record does not establish complete disability. The claimant alleges she is not able to work because she has up to 12 episodes of diarrhea per day and needs bathroom access most of the time. However, this allegation is not corroborated anywhere in her medical records. She reported in January 2013 having only 2-3 bowel movements per day (Exhibit 2F, 80). PAC Bringham noted in April 2013 that the claimant had experienced diarrhea after starting an antibiotic, but was placed on oral Vanco with return of stable formed firm stools. She had recently been started on glipizide for diabetes control with a return of loose stools, but she had only 3-6 per day, and had no incontinence (Exhibit 2F, 88). By May 2013, it was noted that her loose stools were well controlled when she took Lomotil (Exhibit 4F, 9). In October 2013, she reported having only one bowel movement per day (Exhibit 10F, 1), and in January 2014 denied having any diarrhea at all (Exhibit 10F, 33). In March 2014, she reported she had not taken her medication for chronic diarrhea for three weeks, and she had diarrhea only three times a week (Exhibit 14F, 11). Based upon the objective medical records, the undersigned cannot find the claimant has 12 episodes of diarrhea per day.

The claimant has sought regular treatment for her anal issues since her alleged onset date, but her doctors have not noted significant problems and/or issues since her alleged onset date. She was noted to have some new anal papillae in May 2012, but underwent a routine excision at that time. Further treatment was conservative, and consisted of advice to use stool softeners, increase water, and increase fiber intake (exhibit 2F, 50). She also underwent excision for papillae in January 2013, but Dr. Crowell noted she had no masses, fissures, or fistulas (Exhibit 2F, 80-81). Her May 2013 colonoscopy was normal (Exhibit 4F, 9), and her May 2013 sigmoidoscopy procedure showed no abnormalities in the ascending, transverse, descending, or sigmoid colon. It showed only some external hemorrhoids and anal papillae in the rectum (Exhibit 4F, 2). She reported some anal pain in September 2013, but Dr.

Cromwell noted she had some mild scarring but no fissures or fistulas. She was treated conservatively with Flexeril and advice to increase her exercise level to fatigue the levator muscles (Exhibit 8F, 4). Again in October 2013, the doctor noted she had some scarring unchanged from her previous exam; she had no mass or papillae and had a stable rectal/anal exam (Exhibit 10F, 1-2). She had an ER visit in January 2014 for rectal bleeding, but those records show that her labs were remarkable only for mildly elevated WBC count, her rectal exam showed no blood in the rectum and only a small fissure with a small amount of blood. She was given pain medication and discharged home (Exhibit 10F, 30). She underwent banding for a hemorrhoid in January 2014 (Exhibit 10F, 33), and tried various pain relief trials including biofeedback and a ganglion impar block (Exhibit 14F, 3), which did not help. However, by April 2014, she reported her pain was improving, and Dr. Cromwell noted that her anal exam showed some scar tissue but no masses. She had some minor irritation but no evidence of any serious issue. She was to follow up as needed (Exhibit 14F, 18). She was also noted to be exercising by walking on the treadmill (Exhibit 14F, 11), which contradicts her testimony that she is unable to exercise. The claimant has been limited to sedentary work activity to account for her ongoing treatment for anal issues, but has not demonstrated that it would preclude all work activity.

(A.R. 34-36.)

Given this in-depth explanation which details the reasons for finding McManus' claims of additional limitations less than credible, and the substantial evidence in the record supporting the conclusion, this Court must defer to the ALJ's credibility determinations in this case.   While not citing to *Polaski* by name, the written decision reflects ALJ Thompson closely considered McManus' subjective complaints and evaluated their credibility in accordance with the principles and factors set forth therein and subsequent Eighth Circuit precedent.   In finding an absence of objective medical evidence to support McManus' subjective complaints, the ALJ explicitly considered the timing, duration, frequency and intensity of her symptoms, the medical treatments and procedures received by McManus, and medications she took, or not, and the resulting effects. Although McManus' daily activities are not addressed in detail in the above-quoted section of the written decision, the ALJ did note McManus' ability to exercise by walking on a treadmill and, in an earlier portion, noted certain aspects of her life activities and employment as testified to by McManus. (*See* A.R. 31-32.)   All those matters are identified in *Polaski* as factors for evaluating

a claimant's subjective complaints.

Moreover, in conducting this analysis, the ALJ points to several inconsistencies between the subjective complaints of McManus and the medical records.   Most notable, McManus' testimony that she needs to use the restroom "six or seven times a day" and as "many as 11 or 12" due to diarrhea is inconsistent with her medical records which, as noted by the ALJ, indicate much less daily episodes of diarrhea including 2-3 bowl movements per day in January 2013, 3-6 loose stools per day and no incontinence in April 2013, well controlled loose stools in May 2013, one bowel movement per day in October 2013, no diarrhea in January 2014, and diarrhea 3 times a week in March 2014. (*See* A.R. 35.)   Indeed, McManus' testimony on May 14, 2014, that she has "diarrhea constantly" and has "progressively gotten worse" is in direct contradiction with those medical records. (*See* A.R. 60, 62.)

Similarly, McManus' testimony that medications are ineffective and "[n]o matter what I take, I can't stop the diarrhea" (see A.R. 56, 61) directly conflicts with the medical records indicating otherwise, such as PA-C Brigham noting the return of stable formed firm stools with oral Vanco in April 2013 (A.R. 429) and "well controlled" loose stools with Lomotil in May 2013. (A.R. 451.)   On that point, it is well-established that "[i]mpairments that are controllable or amenable to treatment do not support a finding of disability." *Davidson v. Astrue*, 578 F.3d 838, 846 (8th Cir. 2009); *see also*, *e.g.*, *Turpin v. Colvin*, 750 F.3d 989, 993 (8th Cir. 2014) ("We do not consider impairments controllable by treatment or medication to be disabling."; citing *Estes v. Barnhart,* 275 F.3d 722, 725 (8th Cir. 2002)); *Johnson v. Apfel*, 240 F.3d at 1148 ("[I]it is proper for the ALJ to conclude "[i]mpairments that are controllable or amenable to treatment do not support a finding of total disability."; quoting *Hutton v. Apfel,* 175 F.3d 651, 655 (8th Cir. 1999)).

In the same way, McManus' assertion that her condition has "gotten worse" since May 2012 because "there's been more surgeries, there's been more fistulas, fissures, tears" (see A.R.

66-67) appears to be inconsistent with the medical records.   As found by ALJ Thompson, McManus "doctors have not noted significant problems and/or issues since her alleged onset date." (A.R. 35.)   The ALJ's subsequent summary of the records on that point provides substantial evidence supporting his determination regarding the credibility of McManus' claims.

The Eighth Circuit has recently and repeatedly instructed that "'[s]ubjective complaints may be discounted if there are inconsistencies in the evidence as a whole.'" *Igo*, 839 F.3d at 731 (quoting *Pearsall*, 274 F.3d at 1218 (citing *Polaski*, 739 F.2d at 1322)); *see also Gonzales*, 465 F.3d at 895.   "Assessing and resolving credibility is a matter properly within the purview of the ALJ." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016).   Here, in the opinion of this Magistrate Judge, ALJ Thompson sufficiently detailed inconsistencies in this case after thorough consideration of the evidentiary record and, therefore, did not err in the assessment of the credibility of the subjective complaints made by McManus and her mother.

### b. Assessment of PA-C Brigham's Opinions

In support for the inclusion of the additional limitations to her RFC, McManus relies significantly upon the opinions of PA-C Brigham, especially the responses she provided in the Crohn's & Colitis Residual Functional Capacity Questionnaire dated September 23, 2013 (A.R. 483-86). (*See* Pl.'s Mem. pp. 27-28.)   Again, ALJ Thompson explicitly considered but discounted PA-C Brigham's statements when assessing the medical opinion evidence in the record:

> With respect to the opinion evidence, the undersigned has considered the opinion of PAC Bringham who opined in September 2013 that the claimant had colitis, diarrhea, abdominal pain, fistula, and anal fissures. She had pain 6-7 times per day with stooling and was incapable of low stress jobs. She could sit less than 2 hours, stand less than 2 hours and would miss more than four days of work per month (Exhibit 7F, 9F).

> In reaching this conclusion, the undersigned has considered this opinion of PAC Bringham; however, none of these statements are credible as they are not supported by any objective medical findings. This doctor has not built a bridge between medical findings and any particular job related limitation. She does not support her limitation to sitting 2 hours per day and missing more than four days of work per

month with citation to any objective medical evidence that would support these restrictions. Further, as discussed above, the claimant has not had any documented fistulas, fissures, or colitis at any time since her alleged onset date. She did have diarrhea, but this was noted to be controlled with medication and as recently as January 2014 denied having any diarrhea at all (Exhibit 10F, 33). Conclusions made by PAC Bringham without corresponding medical findings are not given controlling weight under the principles set forth at 20 CFR 404.1527 and 416.927 and SSR 96-5p. More weight is given to the objective medical findings and reasonable limitations deduced therefrom. Therefore, the opinion of PAC Bringham is not credible to the extent it is inconsistent with the residual functional capacity assessment reached in this decision.

The undersigned also acknowledges that Dr. Cromwell wrote a letter in June 2013 stating that the claimant had an anal fissure and anal abscess; she had a drainage tube for 4 months followed by flap placement. Her fissure was treated with Botox. In April 2011, papillae were discovered and she had several surgeries to remove them. Her future needs were unknown, and her anal problems can potentially affect life activities (Exhibit 5F, 2). The undersigned notes that the procedures that the doctor described were all performed prior to the claimant's alleged onset date in 2012, and at a time where she was working at substantial gainful activity levels. Further, he does not offer any specific functional limitations, nor does he allege the claimant is completely unable to work.

The undersigned has given significant weight to the State Agency medical opinions (Exhibits 1A, 2A, 5A, 6A). These opinions deserve significant weight due to a number of reasons such as consistency with the other objective medical evidence of record and consistency with the claimant's actual activities including walking on the treadmill.

(A.R. 36-37.)

McManus argues that ALJ "Thompson erroneously discounts the opinion of [her] treating physician's assistant, which is fully supported by the objective medical record" and "relies instead on the opinion of a non-examining agency doctor who did not have nearly half the medical record from which to form his opinion." (Pl.'s Mem. p. 17.)   In her view, the ALJ's findings that PA-C Brigham's statements "are not supported by any objective medical findings" and that she "has not built a bridge between medical findings and any particular job related limitation" are "patently contrary to the medical record." (*Id.* p. 30.)   McManus asserts the opinions of PA-C Brigham "are abundantly supported by the objective medical record" and emphasizes PA-C Brigham's reference to her "symptoms, rectal pain and frequent diarrhea, that directly lead to pain on sitting, the need

for frequent bathroom breaks, and frequent absences." (*Id.* pp. 30-31.)

In contrast, McManus notes Dr. John May never examined her and provided his opinion on June 26, 2013, prior to subsequent medical records and PA-C Brigham's Questionnaire answers of September 23, 2013. (*Id.* p. 31.)   McManus suggests the opinions of PA-C Brigham are entitled to greater weight because she is her primary care provider who McManus has seen "2-3 times a year for the period between November 3, 2008 and September 23, 2013." (*Id.* p. 32.)   Noting PA-C Brigham "has much more knowledge about [her] impairments and the limitations they cause," McManus asserts ALJ "Thompson presented no supportable reason to weigh Dr. May's opinion over that of PA Brigham." (*Id.* pp. 32, 34.)

In response, the Commissioner contends ALJ Thompson properly evaluated the opinion of PA-C Brigham. (Def.'s Brief p. 6.)   In doing so, the Commissioner emphasizes that physicians' assistants are not listed as "acceptable medical sources" in the regulations but, instead, "are considered other sources who may provide evidence to show the severity of an impairment and how that impairment affects an individual's ability to function, but cannot provide medical opinions entitled to controlling weight." (*Id.* citing 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1); SSR 06-3p, 2006 WL 2329939, at 2; *Clark v. Astrue*, 769 F.Supp.2d 1172, 1182 (N.D. Iowa 2011).)   The Commissioner argues that "[a]ny inconsistency in the record can support an ALJ's decision to discount opinions from other sources such as Ms. Brigham." (*Id.*)   In addition, the Commissioner notes that PA-C Brigham only treated McManus three times during the relevant period which began in May 2012 and asserts such "infrequent treatment" supports the ALJ's decision to discount her opinions. (*Id.*)

The Eighth Circuit has provided a comprehensive explanation of the distinction between medical "sources" which is instructive here:

> Social Security separates information sources into two main groups: *acceptable medical sources* and *other sources.* It then divides *other sources* into two groups:

*medical sources* and *non-medical sources*. 20 C.F.R. §§ 404.1502, 416.902 (2007). *Acceptable medical sources* include licensed physicians (medical or osteopathic doctors) and licensed or certified psychologists. 20 C.F.R. § § 404.1513(a), 416.913(a) (2007). According to Social Security regulations, there are three major distinctions between acceptable medical sources and the others: (1) Only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment, *id.,* (2) only acceptable medical sources can provide medical opinions, 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (2007), and (3) only acceptable medical sources can be considered treating sources, 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2007).

*Other sources: Medical sources* include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. *Non-medical sources include* school teachers and counselors, public and private social welfare agency personnel, rehabilitation counselors, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers. 20 C.F.R. §§ 404.1513(d), 416.913(d) (2007).

"Information from these 'other sources' cannot establish the existence of a medically determinable impairment," according to SSR 06–3p. "Instead, there must be evidence from an 'acceptable medical source' for this purpose. However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."

SSR 06–3p is a clarification of existing SSA policies. The SSA explained its reasons for issuing the ruling:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

The ruling directs the SSA's adjudicators to give weight to opinions from medical sources who are not "acceptable medical sources":

> Opinions from "other medical sources" may reflect the source's judgment about some of the same issues addressed in medical opinions from "acceptable medical sources," including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions....

> [D]epending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion.

In general, according to the ruling, the factors for considering opinion evidence include:

> • How long the source has known and how frequently the source has seen the individual;

> • How consistent the opinion is with other evidence;

> • The degree to which the source presents relevant evidence to support an opinion;

> • How well the source explains the opinion;

> • Whether the source has a specialty or area of expertise related to the individual's impairment(s); and

> • Any other factors that tend to support or refute the opinion.

*Sloan v. Astrue*, 499 F.3d 883, 888-89 (8th Cir. 2007).   More recently, the Eighth Circuit explained that "[e]vidence provided by 'other sources' must be considered by the ALJ; however, the ALJ is permitted to discount such evidence if it is inconsistent with the evidence in the record." *Lawson v. Colvin*, 807 F.3d 962, 967 (8th Cir. 2015) (citing *Lacroix v. Barnhart,* 465 F.3d 881, 888-87 (8th Cir. 2006); *Raney v. Barnhart,* 396 F.3d 1007, 1010 (8th Cir. 2005) ("In determining what weight to give 'other medical evidence,' the ALJ has more discretion and is permitted to consider any inconsistencies found within the record.") (citation omitted)); *see also Nowling v. Colvin*, 813 F.3d 1110, 1123 (8th Cir. 2016) (quoting *Raney,* 396 F.3d at 1010).

> An ALJ must assign controlling weight to a treating source's medical opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence." 20 C.F.R. § 404.1527(c)(2). Treating source opinions are generally entitled to substantial

weight, but an ALJ may "justifiably discount" such an opinion when it is "inconsistent or contrary to the medical evidence as a whole." *Martise v. Astrue*, 641 F.3d 909, 925 (8th Cir. 2011) (second passage quoting *Halverson v. Astrue*, 600 F.3d 922, 930 (8th Cir. 2010)). For example, an ALJ may discount a treating source opinion that is unsupported by treatment notes. *Id.* at 925-26.

*Aguiniga*, 833 F.3d at 901-02; *see also Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (ALJ to give controlling weight to treating physician's opinion if well-supported but may have "'limited weight if it provides conclusory statements only, or is inconsistent with the record.'"; quoting *Samons v. Astrue,* 497 F.3d 813, 818 (8th Cir.2007)); *Turpin*, 750 F.3d at 993 ("An ALJ may give less weight to a conclusory or inconsistent opinion by a treating physician.").

"The opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole." *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000) (citing *Jenkins v. Apfel,* 196 F.3d 922, 925 (8th Cir. 1999); *see also Turpin*, 750 F.3d at 993 ("opinion of a non-examining doctor usually is not 'substantial evidence on the record as a whole'").   Such opinions, from non-examining sources, "'are generally given less weight than those of examining sources.'" *Papesh*, 786 F.3d at 1133 (quoting *Wildman*, 596 F.3d at 967).

In light of the Eighth Circuit's directives, here ALJ Thompson properly considered and permissibly discounted the answers and opinions provided by PA-C Brigham where inconsistent with other medical evidence in the record.   Notably, in direct contrast to PA-C Brigham's opinion that McManus' "uncontrolled diarrhea requires frequent bathroom breaks" (A.R. 486), the ALJ again refers to medical records indicating McManus' diarrhea was "controlled with medication and as recently as January 2014 [she] denied having any diarrhea at all." (A.R. 36.)   In addition, the ALJ properly notes there is a lack of sufficient evidence and explanation supporting PA-C Brigham's opinions relating to McManus' sitting limitations and absenteeism from work. *See Sloan*, 499 F.3d at 889.

McManus' argument that the ALJ improperly relied upon "the opinion of a non-examining

agency doctor" instead of PA-C Brigham's opinions is not only without merit but mischaracterizes ALJ Thompson's analysis.   Foremost, the written decision clearly reflects that the ALJ considered the evidence as a whole, including the medical records of various treating sources such as Dr. Olmsted, Dr. Ismail, Dr. Cromwell, Dr. Kapadia, and Dr. Benedetti, in determining McManus' residual functional capacity. (*See* A.R. 32-36.)   In regard to the agency doctors, the ALJ gave their opinions "significant weight" but not controlling weight as seemingly suggested by McManus. (*See* A.R. 37.)   In addition, the ALJ refers to the agency doctors' opinions in general as a whole, and does not specifically refer to Dr. May or appear in any manner to specifically "weigh Dr. May's opinion over that of PA Brigham" as argued by McManus.   Moreover, it appears Dr. May's opinion is limited to reviewing new information presented by McManus on reconsideration in June 2013 and concluding it "does not further restrict the initial decision which is affirmed." (*See* A.R. 105.)   As such, this is not a case where an ALJ improperly gave greater weight to the opinion of a non-treating agency doctor over the credible opinion of a treating medical source. *Compare with Papesh*, 786 F.3d at 1132-34; *Nevland*, 204 F.3d at 858.   Instead, ALJ Thompson properly considered the whole record, not solely the opinion of Dr. May. *See Turpin*, 750 F.3d at 993-94 (concluding ALJ's decision supported by substantial evidence where ALJ did not rely solely on non-treating physicians' opinion but evaluated claimant's own testimony and other medical records including treating doctor's opinion).

For all those reasons, in the opinion of this Magistrate Judge, ALJ Thompson did not err in the assessment of McManus' impairments in determining her residual functional capacity.   The ALJ expressly considered the limitations asserted by McManus, including specific limitations related to prolonged sitting and the need for frequent, unscheduled bathroom breaks and absenteeism from work, but provided sufficient good reasons for discounting them in light of the record as a whole.   While there is some evidence supporting McManus' claims, there is

substantial evidence supporting the ALJ's RFC determination.

### 2.  Capability to Perform Other Jobs

For her final argument, McManus contends the Commissioner has not sustained her burden of proving other work exists in the economy which McManus can realistically perform. (Pl.'s Mem. pp. 40-44.)   "'Once it is established that the claimant cannot return to her previous occupation, the Commissioner bears the burden to show that a significant number of appropriate jobs exist for the claimant.'" *Boyd*, 831 F.3d at 1021 (quoting *Dipple v. Astrue*, 601 F.3d 833, 836 (8th Cir. 2010); *see* 42 U.S.C. § 423(d)(2)(A)).   "The Commissioner may rely on a vocational expert's response to a properly formulated hypothetical question to show that jobs that a person with the claimant's RFC can perform exist in significant numbers." *Guilliams*, 393 F.3d at 804 (citing 20 C.F.R. §§ 404.1566(e), 416.966(e); *Long v. Chater,* 108 F.3d 185, 188 (8th Cir.1997)); *see also Boyd*, 831 F.3d at 1021 ("'One way in which the Commissioner can meet the burden of proof necessary to show that a claimant who suffers from nonexertional pain is not disabled under the Social Security Act is through the testimony of a vocational expert.'"; quoting *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997)).   "A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" *Guilliams*, 393 F.3d at 804 (quoting *Davis v. Apfel,* 239 F.3d 962, 966 (8th Cir. 2001)).

Here, after "[c]onsidering the claimant's age, education, work experience, and residual functional capacity," the ALJ found "there are jobs that exist in significant numbers in the national economy that [McManus] can perform." (A.R. 37-38.)   ALJ Thompson provided the following explanation:

> If the claimant had the residual functional capacity to perform the full range of sedentary work, a finding of "not disabled" would be directed by Medical-Vocational Rule 201.28. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled sedentary occupational base, the Administrative Law Judge asked the

vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as ticket checker (#219.587-010) 780 jobs in the state of Iowa and 62,100 nationally; charge account clerk (#205.367-014) 240 jobs in the state of Iowa and 34,200 nationally, and telephone quote clerk (#237.367-046) 700 jobs in the state of Iowa and 71,300 nationally.

Even if the claimant's mental impairments were found to be severe, and she were further found to have moderate limitations in (1) concentration, persistence and/or pace when attempting complex or detailed job tasks, so the individual is limited to jobs that do not require complex or detailed job processes, little in the way of change in the job process from day to day, jobs that can be learned in 30 days or fewer, and jobs with multi-step, self-evident tasks, easily resumed after momentary distraction, and (2) social functioning, so the individual is limited to jobs that do not require more than occasional work related interaction with the public, coworkers, and supervisors, the vocational expert still identified jobs. The hypothetical individual would still be able to perform the job of ticket checker, and would further be able to perform the jobs of cutter and paster (#249.587-014) 400 jobs in the state of Iowa and 38,000 nationally; and document preparer (#2498.587-018) 425 jobs in the state of Iowa and 38,200 nationally.

Pursuant to SSR 00-4P, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

(A.R. 38.)

McManus challenges the ALJ's finding because, in her view, the vocational expert was "not given an accurate picture" of her limitations. (Pl.'s Mem. p. 40.)   She reiterates the argument that ALJ "Thompson erroneously discounted the opinion of [her] primary care physician's assistant about her need to use the bathroom and her ability to sit for prolonged periods" and, instead, "relied on incomplete evidence from a non-examining agency doctor." (*Id.* p. 42.) Because such limitations were not incorporated in the RFC presented by ALJ Thompson, McManus asserts the testimony of the vocational expert was based upon a "faulty hypothetical

question" and, therefore, "is not substantial evidence that other work exists that [she] can do." (*Id.* pp. 42-43.)   She further asserts that, based on the additional testimony provided by the vocational expert in response to her counsel's questions, there is no full-time work she can perform if limitations relating to bathroom breaks and prolonged sitting are included. (*Id.* pp. 43-44.) Consequently, McManus insists she is disabled within the meaning of the Commissioner's regulations and the case should be remanded for calculation of benefits. (*Id.* p. 44.)

In response, the Commissioner contends ALJ Thompson properly found McManus could perform work existing in significant numbers in the national economy. (Def.'s Brief pp. 15-16.) The Commissioner emphasizes that the hypothetical question presented to the vocational expert need only reflect the impairments and limitations the ALJ finds credible. (*Id.*)   In the Commissioner's view, because the ALJ properly discounted PA-C Brigham's opinions and discredited the subjective complaints of McManus, the ALJ was not required to include the additional limitations as urged by McManus in the RFC or hypothetical question. (*Id.* p. 16.)

The Commissioner's argument on this point is supported by well-established law. According to the Eighth Circuit, an "'ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole.'" *Martise*, 641 F.3d at 927 (quoting *Lacroix*, 465 F.3d at 889 (quotation and citation omitted)); *see also Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005) ("The hypothetical question need only include those impairments and limitations found credible by the ALJ."). Stated otherwise, "the hypothetical question to the vocational expert [does] not need to incorporate the additional limitations the ALJ had properly disregarded." *Renstrom*, 680 F.3d at 1067 (citing *Wildman,* 596 F.3d at 969 ("[T]he ALJ was not obligated to include limitations from opinions he properly disregarded.")); *see also, e.g.*, *Guilliams*, 393 F.3d at 804 ("Discredited complaints of pain . . . are properly excluded from a hypothetical question so long as the ALJ had reason to

discredit them."); *Pearsall*, 274 F.3d at 1220 ("The ALJ's hypothetical question properly included all impairments that were accepted by the ALJ as true and excluded other alleged impairments that the ALJ had reason to discredit."); *Haynes v. Shalala,* 26 F.3d 812, 815 (8th Cir. 1994) ("A hypothetical question need only include those impairments that the ALJ accepts as true.").

As discussed above, ALJ Thompson permissibly discredited the subjective complaints of McManus and discounted the opinions of PA-C Brigham which supported the potential additional limitations to the RFC relating to restroom breaks, prolonged sitting and absenteeism.   As such, those limitations were properly excluded.   The hypothetical questions presented by ALJ Thompson were therefore proper and the vocational expert's responses constitute substantial evidence supporting the ALJ's determination that McManus was not disabled. *See*, *e.g.*, *Renstrom*, 680 F.3d at 1067; *Martise*, 641 F.3d at 927; *Guilliams*, 393 F.3d at 804.   In the opinion of this Magistrate Judge, the Commissioner sufficiently met the burden of showing that a significant number of appropriate jobs exist which McManus can perform.

## V. RECOMMENDATION

After a thorough examination of the Administrative Record and in accordance with the standards of review the Court must follow, this Magistrate Judge concludes that the ALJ's determination that Julie A. McManus is not disabled under the Social Security Act complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Accordingly, it is recommended that the final decision denying disability insurance benefits and supplemental security income to Ms. McManus be affirmed and judgment be entered in favor of defendant Commissioner of the Social Security Administration.

Pursuant to Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1, the parties shall have until February 1, 2017, to serve and file specific objections to the proposed findings and recommendations.

Dated January 18, 2017.

_____
STEPHEN B. JACKSON, JR.
UNITED STATES MAGISTRATE JUDGE